[No. G014592. Fourth Dist., Div. Three. June 28, 1996.]

FOOTHILL PROPERTIES, Plaintiff and Respondent, v.
LYON/COPLEY CORONA ASSOCIATES, L.P. et al., Defendants and
Appellants.

[No. G016616. Fourth Dist., Div. Three. June 28, 1996.]

FOOTHILL PROPERTIES, Plaintiff and Appellant, v.
LYON/COPLEY CORONA ASSOCIATES, L.P., et al., Defendants and
Respondents.

1544

## COUNSEL

McClung & Davis, Charles E. McClung, Call, Clayton & Jensen, L. Whitney Clayton, James A. Durant and Seth L. Liebman for Plaintiff and Appellant and for Plaintiff and Respondent.

Kindel & Anderson, Ronald J. Kohut and Megan L. Wagner for Defendants and Appellants and for Defendants and Respondents.

## OPINION

**WALLIN, J.**—Foothill Properties (Foothill) appeals from the judgment in favor of, and granting attorney fees to, Lyon/Copley Corona Associates, L.P., Senior Corp., and L/C Development Corporation (collectively, Lyon), contending the trial court erroneously: (1) determined Lyon had fulfilled its mapping obligations under its contract with Foothill;[1] and (2) awarded Lyon its attorney fees.[2] In a consolidated appeal, Lyon contends the trial court erroneously awarded discovery sanctions against it. We affirm the judgment in favor of Lyon, including the attorney fees award, and reverse the order for sanctions.

In early 1990, Lyon purchased the eastern part of the Foothill Ranch in South Corona from Foothill (the purchase property) and entered into an option agreement for the western part (the option property).[3] The City of Corona had approved a "specific plan" for the "orderly development" of the property, including a "phasing and public facility financing plan for the logical and orderly improvement" of the infrastructure systems. It had also approved a tentative tract map, TTM 25000, which subjected final approval

---

[1]This contention contains a claim the trial court erroneously interpreted the terms of the contract.

[2]Foothill also contends the erroneous interpretation of the contract requires a reversal for a retrial on the issue of damages, but admits it is merely a prejudicial error argument. Because we find the trial court's interpretation was correct, we need not address this contention.

[3]Only the option agreement was at issue in this case.

to numerous conditions relating primarily to planning, designing and construction of the infrastructure.

The relevant portion of the final option agreement, section 3.2.1 provided: "*Preparation of Tract Maps.* [Lyon] shall, at [Lyon's] sole cost and expense, diligently pursue the preparation of, to an immediate recordable condition, final subdivision maps in respect of TTM 25000 for [the option property]." Tentative versions of the agreement had required Lyon to prepare final maps on or before specific dates. One draft specified the earlier of the exercise of the option agreement or its expiration in May 1992, and a later draft specified the expiration date. Lyon rejected these proposals as unacceptable.

A related portion of the option agreement, section 3.2.2 provided: "[Lyon's] obligations pursuant to this Section 3.2 shall terminate upon [Lyon's] written notice to [Foothill] that [Lyon] is terminating this agreement." Section 9.1 allowed Lyon to terminate the agreement at any time upon specified notice. Earlier unacceptable drafts of section 3.2.2 had provided that the mapping obligations survived termination of the agreement.

The mapping provisions were not part of the letter of intent that preceded the option agreement. They arose after the parties had agreed on a $6.5 million option price. Fred Bosley, Lyon's negotiator, told Foothill's managing partner, Ed Halvajian, Lyon planned to develop half the property and sell the remainder to merchant builders subject to demand. The purchase property would be developed first with the option property to follow, in other words from east to west.[4] The first agreement draft containing the mapping obligation was prepared by Foothill's attorneys without input from Lyon. Halvajian told Bosley the provision would fit into Lyon's sequential development plan and would not cost Lyon more than it would otherwise spend.[5]

Lyon rejected two drafts that required completion of the final mapping by a date certain. The parties finally agreed to the "loose language . . .

---

[4]Although some testimony contradicted Bosley on this issue, we construe the facts in favor of Lyon, the prevailing party below. (*Golden West Baseball Co.* v. *City of Anaheim* (1994) 25 Cal.App.4th 11, 22 [31 Cal.Rptr.2d 378] [reviewing court resolves conflicting extrinsic evidence (e.g., credibility questions) in contract interpretation cases in favor the judgment]; see also *Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158] [reviewing courts generally resolve conflicting evidence in favor of the prevailing party].)

[5]The reasoning behind the latter comment is apparently that Mello-Roos (Gov. Code, § 53318 et seq.) bonds would fund mapping and other infrastructure expenses. Mello-Roos funds largely covered mapping expenses for the purchase property.

'diligently pursue' " in section 3.2.1.[6] The final version of section 3.2.2 and the addition of section 9.1 was to afford a "right for an out" from the obligation completely.

Although Lyon had the exclusive right under the agreement to possess and occupy the option property, Foothill had the right to inspect Lyon's development plans and activities, and to be apprised of the work by Lyon's consultants. Lyon was required to exercise its development rights "in good faith, in fairness and with due regard to [Foothills'] interests," and had to exercise its development rights in "accordance with the standards of a prudent, competent, and experienced developer."

The option agreement required Lyon to act in accordance with the "Anticipated Course of Development," defined by reference to the specific plan, TTM 25000 and the "appurtenant contracts," which included development, sewer, and water agreements between Foothill and the City of Corona. The specific plan included the "phasing plan" for development of the property, which provided for sequential development from the purchase property to the option property.

Documents Foothill prepared contemplated final map recordation on the purchase property beginning in 1991 and on the option property between 1993 and 1998, after the option would expire. Other documents showed the parties contemplated economic conditions might affect the rate of development. Issuance of Mello-Roos bonds to finance the infrastructure was to be staggered to allow orderly, sequential infrastructure construction. Construction had to be completed within three years of issuance. A separate bond sale was planned for the option property.

After the option agreement was executed, Lyon worked on aspects of the infrastructure that were prerequisite to filing the final maps, such as drainage, street alignment, water and sewer service, and parks. The work included studies, plans, and location approvals.

In 1990 the real estate market began to fall dramatically and it became extremely difficult to obtain construction financing. Lyon had to scale back its plans and decided to finish three tracts in process, and determine the feasibility of developing the option property. In November 1990, Foothill, Lyon, their bond counsel, and a Corona representative concluded Mello-Roos bonds should not be sold for the option property because rapidly falling land values caused an unacceptable loan to value ratio.

---

[6]Other than the comment that "diligently pursue" was intended to be "loose language," none of the witnesses recalled why the language was added.

Tom Paradise, whom Lyon had hired as project manager from Foothill with Foothill's blessing,[7] prepared a draft letter in April 1992 summarizing work done on the project, and indicated Lyon had been "proceeding with the requisite engineering studies [as a prerequisite to recording the final subdivision map] since [the parties] entered into the Option Agreement." Paradise considered the engineering work and off-site infrastructure studies to be part of the mapping work for the option areas. He eventually postponed drafting final improvement plans for the Mello-Roos district due to infrastructure problems, but infrastructure work continued.[8]

During the option period, Paradise had numerous meetings with Foothill personnel. Foothill was regularly informed of the progress of the development of both the purchase and the option properties. It never voiced any displeasure about the mapping status on the option property until after Lyon announced it would not exercise the option. In April 1992 Halvajian sent Lyon a letter accusing it of breaching section 3.2.1. He told a Foothill employee and Paradise the letter was to encourage Lyon to "cut a new deal" regarding the option property.

I

Foothill contends the trial court erroneously determined Lyon had fulfilled its mapping obligations under the option agreement. It reasons Lyon was required to either complete the mapping process or terminate the agreement. It misconstrues the agreement.

"The precise meaning of any contract . . . depends upon the parties' expressed intent, using an objective standard. [Citations.] When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible. [Citation.] . . . [¶] We review the agreement and the extrinsic evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility. [Citation.] If it does, we must accept any reasonable interpretation adopted by the trial court. [Citation.]" (*Golden West Baseball Co.* v. *City of Anaheim, supra,* 25 Cal.App.4th 11, 21-22, fns. omitted.)

---

[7]Indeed, Foothill paid Paradise a $250,000 bonus on leaving plus a note for $250,000 more, payable one month after the end of the option period.

[8]For example, problems relating to water supply impeded mapping because the final infrastructure maps had to show water lines.

▆▆▆▆ Lyon correctly notes there were many instances where Foothill's and Lyon's witnesses gave diametrically opposing testimony. Foothill concedes at least one of these instances,[9] and suggests we should simply assume all factual findings on these matters were against it and interpret the contract de novo based on that assumption. It cites no authority for that approach, which seems at odds with the general legal principle that conflicting extrinsic evidence requires the appellate court to accept any reasonable interpretation adopted by the trial court. (*Golden West Baseball Co.* v. *City of Anaheim, supra,* 25 Cal.App.4th at p. 21.) But because the outcome is not affected by the approach used, we will review the option agreement de novo.

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643; see also *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 640 [162 Cal.Rptr. 52].)

The trial court determined section 3.2.1, requiring Lyon to "diligently pursue" final mapping, was to be read in the context of section 7.6.2, which required Lyon to undertake a "diligent and competent prosecution" of development, including "preparation and processing of final subdivision maps." The court relied on the language: "[Lyon] will exercise [Lyon's] Development Rights in accordance with the standards of a prudent, competent and experienced developer."[10] It concluded that Lyon's decision to stop mapping activity on the option property was reasonable, given the sequential development of the properties, the slump in the housing market, and delays in implementing the infrastructure. In other words, the trial court concluded no "prudent, competent and experienced developer" would have prepared final mapping for a project that was not economically feasible.

[9]Foothill agrees it is bound by the trial court's finding the purchase and option properties were to be developed in sequential order, and "preparation of final subdivision maps on the Option Property was to be performed in phases in the normal course of development of the ranch as a prudent developer."

[10]The entire section read: "*7.6.2 Diligent and Competent Prosecution.* [Foothill] is granting [Lyon's] Development Rights to [Lyon] with the expectation of and in consideration of the following: [¶] (a) That [Lyon] will exercise [Lyon's] Development Rights in good faith in fairness and with due regard to the interest of Seller. [¶] (b) That [Lyon] will exercise [Lyon's] Development Rights in accordance with the standards of a prudent, competent and experienced developer. [¶] (c) That [Lyon] will exercise [Lyon's] Development Rights such that the course of development of Foothill Ranch will continue in a timely manner, particularly with respect to the preparation and processing of final subdivision maps in respect of TTM 25000."

Foothill suggests section 7.6.2 cannot be read in conjunction with section 3.2.1 because the former dealt with Lyon's "Development Rights," while the latter dealt with Lyon's development obligations. Not so. Section 7.6.2 is patently concerned with Lyon exercising its rights in a manner consistent with Foothill's interests. Anyone with a modicum of knowledge about land development can discern Foothill's concern was that Lyon would do nothing during the option period, and if it did not exercise the option, the property would be egregiously behind in the development process when it reverted to Foothill. Understanding that, one can easily conclude the provisions of sections 3.2.1 and 7.6.2 were both intended to promote the same interest, and should be read together.

Foothill urges " 'diligent pursuit' of the mapping obligation must be determined in the context of a prudent, competent and experienced developer which had the duty to fulfill the mapping obligation." It points to sections 9.1 and 3.2.2, which allowed Lyon to terminate the option at any time and provided its obligation to diligently pursue preparation of the final maps would cease upon termination, and concludes Lyon's options were to complete the mapping or terminate the agreement. But if those were the parties' intentions, there would have been no need to amend section 3.2.1 to delete the completion requirement on a date certain and to add the "diligently pursue" language. The termination clause would be the safety valve. The amendment to 3.2.1 portends another protection for Lyon. It was never required to complete the mapping or terminate the agreement as long as it diligently pursued the mapping process.

Foothill asserts "the question still remains as to whether Lyon's conduct constituted 'diligent pursuit.' " None of the witnesses provided insight as to what the parties intended the term to mean, and experts testified it had no technical meaning. The trial court looked to dictionary definitions of "diligent" as "persevering and careful in work" and "done with careful steady effort", and of "pursue" as "to proceed along . . . or continue with." Even if section 7.6.2 did not provide that diligent pursuit was to be viewed from the context of the "prudent, competent, and experienced developer," we would infer it from the context.

 "Although the law implies in every contract a covenant of good faith and fair dealing, which requires neither party do anything which will deprive the other of the benefits of the agreement [citation], '[t]he precise nature and extent of the duty imposed . . . will depend on the contractual purposes.' [Citations.]" (*Ellis* v. *Chevron, U. S. A., Inc.* (1988)

201 Cal.App.3d 132, 139 [246 Cal.Rptr. 863], italics omitted.) Depending on the circumstances, that duty may go no farther than to act in a commercially reasonable manner. (*Id.* at p. 140.) Modern law tends to look at duties in the commercial context in such terms. (See, e.g., Cal. U. Com. Code, §§ 2503 (com.), 2609 (com.), 3501, 10103.)

Lyon diligently pursued preparation of final subdivision maps in a commercially reasonable manner. Although, as the trial court found, Lyon decided to indefinitely postpone tentative and final mapping in August 1991, it continued to work on the infrastructure, a prerequisite to recording final maps, until the option agreement expired. Evidence Foothill believed Lyon was fulfilling its obligations is provided by Foothill's failure to make any complaint at all until it used that tactic at the end of the option period to attempt renegotiation.

We conclude the proper construction of the agreement, in keeping with the parties' expectations, is that Lyon would conduct the mapping process as a reasonably prudent developer, given the economic and logistical circumstances. Put differently, Lyon's duty was to proceed with mapping as Foothill would have if it had been in control of the property. Ample evidence supports the conclusion Lyon complied with this standard.

## II

Foothill argues the trial court erroneously awarded Lyon its attorney fees. To determine the issue we must reconcile two statutory provisions that deal with attorney fees awards.

Foothill and Lyon agree the option agreement provided for attorney fees to the prevailing party in the event of litigation. Civil Code section 1717 speaks directly of contract provisions for attorney fees and costs, providing that the prevailing party, typically the party who recovered greater relief on contract issues, is entitled to attorney fees. The court also has discretion to determine no party prevailed. (Civ. Code, § 1717, subd. (b)(1).)[11] Foothill relies on this section.

---

[11]Section 1717 provides in relevant part: "(a) In any action on a contract, where the contract specifically provides [for] attorney's fees and costs . . . the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs. [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit. . . . [¶] (b)(1) The court . . . shall determine

Code of Civil Procedure section 1032, which provides for recovery of costs by the prevailing party, defines "prevailing party" as the party with a net monetary recovery, and a defendant who obtains a dismissal or avoids all liability. If a party is given other than monetary relief, and in all situations not specified, the court has discretion to determine who is the prevailing party.[12] Code of Civil Procedure section 1033.5 specifies attorney fees authorized by contract are an item of costs under section 1032.[13]

Lyon contends Code of Civil Procedure section 1032 is applicable and the trial court had discretion to award it attorney fees because Foothill received "other than monetary relief." It reasons Foothill received judgment in its favor, at most, only on its sixth cause of action for a constructive trust. That cause of action arose from Lyon's failure to turn over the development plans and documents at the end of the option period under section 10.1 of the agreement. No damages were sought.

Foothill argues it was awarded sanctions as a result of its motion to compel production of those plans and documents during discovery, and the sanctions constituted a net monetary recovery. Foothill cites no authority for its argument and we are aware of none. It is axiomatic attorney fees awarded as discovery sanctions are not an item of damages in a cause of action. (See *Mabee* v. *Nurseryland Garden Centers, Inc.* (1979) 88 Cal.App.3d 420, 425 [152 Cal.Rptr. 31] [attorney fees are part of a cause of action only in cases such as false imprisonment, malicious prosecution, and attorney fee disputes]; see also *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210

who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section."

Subdivision (b)(2) allows a defendant who has tendered the full amount due to the plaintiff, and has alleged the tender in the answer, to be deemed the prevailing party. Lyon made no such allegation in its answer.

[12]Section 1032 provides in relevant part: "(a) As used in this section, unless the context clearly requires otherwise: [¶] . . . [¶] (4) 'Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides . . . . [¶] (b) Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."

[13]Section 1033.5 provides in relevant part: "(a) The following items are allowable as costs under Section 1032: [¶] . . . [¶] (10) Attorney fees, when authorized by any of the following: [¶] (A) Contract."

Cal.Rptr. 211, 693 P.2d 796].) We decline to interpret "net monetary recovery" in Code of Civil Procedure section 1032 to include discovery sanctions.

Foothill cannot prevail on this argument for another reason. The only cause of action on which it arguably prevailed was for a constructive trust arising out of Lyon's alleged failure to turn over the development documents. Because any duty by Lyon arose from the option agreement, the cause of action sounded in contract. (See *GHK Associates* v. *Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 878 [274 Cal.Rptr. 168]; see also *In re Marriage of Edwards* (1995) 38 Cal.App.4th 456, 460 [45 Cal.Rptr.2d 138]; *Estate of Mullins* (1988) 206 Cal.App.3d 924, 928-929 [255 Cal.Rptr. 430].)

As we noted in *McLarand, Vasquez & Partners, Inc.* v. *Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450 [282 Cal.Rptr. 828], "We emphatically reject the contention that the prevailing party for the award of costs under section 1032 is necessarily the prevailing party for the award of attorneys' fees." (231 Cal.App.3d at p. 1456. at p. 1456.) Civil Code section 1717 is the applicable statute when determining whether and how attorney fees should be awarded under a contract. (*Ibid.*) It is the statute that expressly deals with attorney fees under a contract, and to apply Code of Civil Procedure section 1032 in such cases would obviate Civil Code section 1717. (See *Levine* v. *Pollack* (1995) 37 Cal.App.4th 129, 138 [43 Cal.Rptr.2d 491] [" 'A statute must be construed in the context of the entire statutory scheme of which it is a part, in order to achieve harmony among the parts. [Citation.] Also to be considered is the maxim that " '. . . statutes should be interpreted in such a way as to make them consistent with each other, rather than obviate one another.' " [Citation.]' [Citation.] Moreover, a statute must be construed ' " 'in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' " [Citation.]' [Citations.]"].)

Foothill argues neither party recovered greater relief, so the trial court's only option under Civil Code section 1717, was to declare no party prevailed. It reasons a party can only be deemed to have recovered greater relief if it obtained affirmative relief, not if it was a defendant who merely successfully defended. A similar contention was rejected in *Hsu* v. *Abbara* (1995) 9 Cal.4th 863 [39 Cal.Rptr.2d 824, 891 P.2d 804], where the Supreme Court held the trial court abuses its discretion by failing to award attorney fees to a defendant who secures a " 'simple, unqualified win.' " (*Id.* at p. 876.)

The judgment reflects Lyon obtained a simple, unqualified win, as it prevailed on all causes of action. (*Hsu* v. *Abbara, supra,* 9 Cal.4th at p.

876.) ■ ■ "'A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. . . .' [Citations.]" (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193], italics omitted.) The trial court did find Lyon breached section 10.1 of the option agreement, but it also found Foothill suffered no damage. Henninger testified the documents, which were provided during discovery, were so few and of so little consequence, they would be of no help to Foothill. Foothill obtained no affirmative relief in the judgment.

Even if we decided the court's finding Lyon breached section 10.1 provided some basis to conclude Foothill received *some* relief, we would still uphold the trial court's determination. ■ ■ As the Supreme Court noted in *Hsu* v. *Abbara*, *supra*, 9 Cal.4th at page 877: "'[C]ontractual provisions for attorney fees will not be inflexibly enforced' and . . . 'the form of the judgment is not necessarily controlling, but must give way to equitable considerations.' . . . [I]n determining litigation success, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' . . . [Citations.]" (Italics omitted.)

In making this pronouncement the *Hsu* court cited with approval *National Computer Rental, Ltd.* v. *Bergen Brunswig Corp.* (1976) 59 Cal.App.3d 58 [130 Cal.Rptr. 360]. In *National Computer Rental*, the court upheld an award of attorney fees to a defendant because it prevailed on the only disputed contract cause of action, even though the plaintiff obtained a nominal judgment on an amount never disputed or litigated. (*Id.* at p. 63; see also *Epstein* v. *Frank* (1981) 125 Cal.App.3d 111, 124 [177 Cal.Rptr. 831] [the party who prevails on all of the issues which were actually litigated at the trial will be deemed prevailing, even though the judgment may be entered in favor of opposing party]; cf. *Krueger* v. *Bank of America* (1983) 145 Cal.App.3d 204, 217 [193 Cal.Rptr. 322] [plaintiffs only prevailed on one cause of action, but it was not a hollow victory].)

Foothill's "victory" was, at most, pyrrhic. Although Lyon filed an unverified answer denying the allegations in the sixth cause of action and there was a discovery dispute concerning further *identification* of the documents, Foothill's right to the documents was never seriously contested by the parties. And, even if Lyon breached the provision, Foothill was not materially damaged and received the documents before trial. The fight in this case

was not about the documents. The trial court did not abuse its discretion by determining Lyon prevailed.[14]

### III

In the consolidated appeal, Lyon argues the trial court erroneously awarded discovery sanctions against it because its opposition to the motion to compel production of documents was substantially justified. Its contention is well taken.

Foothill served numerous sets of discovery requests on Lyon, including demands for production and inspection of documents. Lyon responded it would produce all documents relating to Foothill Ranch. Lyon's attorney said she intended to give Foothill all nonprivileged documents. Although there were some objections and delays, Lyon produced voluminous documents in about three months and Foothill reviewed them over several days.

Just before the document review took place, Foothill propounded a second request for inspection of documents which, for the first time, specifically mentioned budget information. Lyon objected, in part on the ground the documents were proprietary and confidential. Around this time, Lyon's lawyer indicated, contrary to her previous assertions, there might be documents, particularly budgets that had not been produced before.

To determine what documents, if any, had not been produced, Foothill noticed the deposition of Lyon's most knowledgeable employee on the subject. Just before the deposition, Lyon's attorney told Foothill's attorney certain budget information, such as strategy retreat documents and sales projection information, had been withheld from the documents produced. Lyon offered to produce the documents if Foothill would agree to confidentiality. When Foothill refused, Lyon indicated it would seek a protective order, but agreed to produce the disputed documents once the protective order issue had been resolved.[15]

Lyon filed a motion for a protective order limiting dissemination of profit and loss, budgetary, and business projection information, and Foothill responded with a motion to compel production of the documents. The court granted an "eyes only" protective order, to documents which had not yet been produced, and granted Foothill's motion to produce the documents, imposing sanctions of $9,000 against Lyon.

As a preliminary matter, Lyon asserts the sanctions were based on Code of Civil Procedure section 2031, subdivision (a)(1) or section 2023, subdivision

---

[14]Because we reach this conclusion, we need not address Lyon's arguments concerning waiver and invited error.

[15]Foothill had previously agreed to maintain a specified level of confidentiality as to some documents Lyon produced relating to sensitive business information.

(a)(8), which allow for sanctions when a motion to compel is unsuccessfully opposed without justification, rather than Code of Civil Procedure section 128.5, which allows sanctions for bad faith tactics that are frivolous or solely intended to cause unnecessary delay. Lyon is correct. Section 128.5, subdivision (c) requires that any sanction order under that section be in writing and recite the circumstances justifying the order. Nothing in the sanction order suggests the court made requisite findings, so we infer the order was based on the former statutes. (*Slemaker* v. *Woolley* (1989) 207 Cal.App.3d 1377, 1379-1380 [255 Cal.Rptr. 532].)

■ The propriety of a discovery sanction award is reviewed using the abuse of discretion standard. (*Young* v. *Rosenthal* (1989) 212 Cal.App.3d 96, 114 [260 Cal.Rptr. 369].) It can be overturned only if it was not based on a reasoned judgment or is at odds with " ' "legal principles and policies appropriate to the particular matter at issue." ' " (*Id.* at p. 115.) Put differently, we will uphold the award unless it " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham* v. *Superior Court, supra,* 2 Cal.3d 557, 566.)

■ As noted, discovery sanctions based on a motion to compel are permissible only when the motion is unsuccessfully opposed "without justification." (Code Civ. Proc., §§ 2031, subd. (e), 2023, subd. (a)(8).) Thus, we will uphold the sanction award unless the court had no rational basis to conclude Lyon's failure to produce the documents was unjustified. That was the case.

To understand that conclusion, we first note what was not at issue in the motion to compel. Although Foothill goes to great lengths to emphasize Lyon's sloth in providing the documents Foothill took several days to review, that conduct could not have been at issue in the motion to compel because the documents had already been produced. Nor could the motion have been based on Lyon's failure to disclose the documents at issue because all parties agree Lyon had disclosed the documents before the motion to compel was brought.[16] Indeed, the motion was not brought until after Lyon disclosed the documents' existence, sought a confidentiality agreement, announced its intention to move for a protective order, and did so.

The motion to compel had to be based perforce on Lyon's refusal to turn over the documents after disclosure until Lyon litigated its motion for a protective order. The issue is whether Lyon's refusal to turn over the documents pending resolution of its motion for a protective order was substantially justified.

---

[16]Because this is so, Foothill's argument we must construe the record as establishing Lyon wrongfully failed to disclose the documents initially is immaterial.

Code of Civil Procedure section 2031, subdivision (e) gives the court authority to issue protective orders specifying "the inspection be made only on specified terms and conditions," and "a trade secret or other confidential research, development, or commercial information not be disclosed, or be disclosed only to specified persons or only in a specified way." (Code Civ. Proc., § 2031, subd. (e)(4) and (5).) The trial court apparently relied on this section in granting the protective order, and Foothill does not claim it abused its discretion. (See *GT, Inc.* v. *Superior Court* (1984) 151 Cal.App.3d 748, 755 [198 Cal.Rptr. 892] [upholding protective order regarding disclosure of financial information to a competitor].)

Foothill argues the sanctions were justified because the protective order did not cover all the documents Lyon withheld. It premises the argument on a statement by Lyon's attorney in a letter she sent to Foothill's counsel after the protective order was granted, stating she "*conservatively* interpreted [protective] order not to include [certain] budget documents . . . ." (Italics added.) Counsel's interpretation of the order, particularly a "conservative" one, is irrelevant. Because Foothill's argument is premised on that interpretation, it must fail.[17]

Given Lyon's valid claim of a right to a protective order regarding the unproduced documents, it had substantial justification, as a matter of law, for withholding them until the motion for the protective order was determined, and for opposing the motion to compel.[18] It is axiomatic[19] the court "exceeded the bounds of reason" when it imposed sanctions, thus abusing its discretion.[20]

The judgment in favor of Lyon and award of attorney fees is affirmed. The order granting Foothill's motion to compel is reversed insofar as it awards sanctions against Lyon. Lyon is entitled to its costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

The petition of appellant Foothill Properties in No. G016616 for review by the Supreme Court was denied September 18, 1996.

---

[17]Because the letter was not part of the record on appeal, Foothill moved to augment the record to include it. It is irrelevant, and we deny the motion.

[18]This conclusion is bolstered by the trial court's finding Lyon waived the right to a protective order as to documents it had already produced.

[19]In this instance "axiomatic" means, in part, the parties have directed us to no authority on point and we have found none.

[20]Because we reach this result, we need not consider Lyon's arguments the hearing on sanctions was fundamentally unfair and the sanctions were excessive. Foothill's request for sanctions on appeal is denied.